# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

Chasity Phillips, individually, )
and as guardian of her minor child, )
A.P., on behalf of herself and those )
similarly situated, )
 )
   **Plaintiff,** )
 )
 **v.** )  **Case No.: 19-4172**
 )
**JUUL LABS, INC., and** )
**ALTRIA GROUP, INC.,** )
 )
   **Defendant.** )

## CLASS ACTION COMPLAINT

Plaintiff Chasity Phillips, by and through her attorneys, brings this Class Action

Complaint against Defendants JUUL Labs, Inc., ("JUUL") and Altria Group, Inc. ("Altria"),

on behalf of herself, and as guardian of her minor child, A.P., and all other similarly situated

persons who purchased a JUUL e-cigarette or related JUUL product in the United States.

Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and

upon information and belief as to all other matters based on the investigation of counsel.

## NATURE OF THE CASE

1. A.P. was a bright, social 16-year-old who began using JUUL around May of

2018. What started as something he did only in the evenings and on weekends quickly

escalated, over just a few short months, into an addiction that A.P. thought about and partook

in all day throughout each day. When she first became aware of A.P.'s JUUL use, Phillips

attempted to get A.P. to stop cold-turkey. By this point, however, A.P. was so addicted to

nicotine that he became extremely anxious and irritated when he did not have it. The changes

in A.P.'s behavior led to tension in the family and frequent arguments. In order to stop using JUUL, A.P. eventually had to go on medication for his anxiety and Phillips helped him taper off his nicotine intake over the course of approximately two months. Although A.P. is no longer consistently using JUUL, it is impossible to know what the long-term psychological and health impacts to A.P. will be because nicotine is addictive and exposure to it is not safe for anyone under age 26.

2.     A.P. fell prey to JUUL's youth targeted marketing and enjoyed the fruit flavored JUUL pods, which were designed to appeal to young people who were inexperienced with tobacco use. A.P. also spent a lot of time watching "vape trick" videos on YouTube. He came to idolize the people in the videos and spent countless hours attempting to replicate the tricks he saw online. A.P. thought JUUL was harmless and fun – just as social media portrayed it.

3.     A.P. was not alone. This case involves a scheme in interstate commerce to mislead and defraud teens and others by inducing them to buy a new e-cigarette called JUUL. Defendants devised and deployed this fraudulent scheme to enter and dominate the e-cigarette market through deception and misdirection. Defendants did so through an enterprise of third-parties they used to deceive people about the attributes and health benefits of "JUULing." This fraudulent scheme has caused injury to the property of millions of people who have purchased these JUUL products.

4.     Countless lives have been horribly and irreparably impacted by nicotine use and addiction. For years, cigarette manufacturers managed to effectively market their products as trend-setting and relatively harmless. And perhaps the most effective strategy was the marketing of traditional cigarettes to teenagers. Advertising depicted smokers as cool and

attractive, the type of person America's youth looked up to. Cigarette manufacturers knew that teenagers were more susceptible to becoming addicted to nicotine. And if you could addict a 16-year old to smoking, you gained a customer for decades, if they lived that long. Through studies once concealed but later made public, and countless deaths, Americans learned that smoking traditional cigarettes was highly addictive and posed serious, often fatal, health hazards. Fortunately, cigarette smoking has been on the decline.

5. But, where most saw a positive change, others saw opportunity. As Americans became more health conscious, a stigma had grown around smoking traditional cigarettes. Cigarette smoking was no longer cool and the smell of second-hand smoke scattered bystanders. However, the addictive nature of nicotine remained and, to some, presented an opportunity for profit.

6. Though not alone in pursuing development of electronic cigarettes, JUUL did so with a familiar strategy. Taking a page from big tobacco's playbook, which includes defendant Altria, JUUL, in concert with its advertising agencies, developed a product and marketing strategy that sought to portray its e-cigarette as trend-setting, stylish and used by the type of people teenagers look up to. In addition to advertisements eerily similar in scheme and content to those of traditional cigarette manufacturers, JUUL utilized social media extensively, knowing full well that teenagers are the primary users of social media. In particular, JUUL enlisted the services of social media "influencers" – social media personalities with large followings – to surreptitiously promote JUUL's products ("Social Media Influencers"). [1] Similarly, JUUL developed an "affiliate program" whereby it paid third parties ("JUUL

---

[1] The identities of the Social Media Influencers are unknown to Plaintiff, but within the possession of defendant JUUL.

Affiliates") to refer would-be customers to JUUL's website.[2] JUUL forbid the JUUL

Affiliates from disclosing their affiliation with JUUL. Like big tobacco, JUUL targeted

America's youth, hoping to gain customers for life. And it worked.

7. Nicotine use amongst America's youth is sharply on the rise. Parents, teachers,

health care practitioners and now the U.S. Government are combatting the meteoric rise of

vaping amongst teens. E-cigarette use in general increased 78% among high school students

and 48% among middle school students in a single year from 2017 to 2018. The FDA

Commissioner called these results "astonishing." The Secretary of the U.S. Department of

Health and Human Services, Alex Azar, recently stated at a press conference: "We have never

seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

8. JUUL knew of the significant health risks posed by nicotine use, in particular

vaping, and, with that knowledge, developed an e-cigarette that is more potent than any other.

JUUL was also aware that nicotine has a more significant adverse impact on adolescents,

including an increased risk of becoming addicted to nicotine. With that knowledge, JUUL

developed a marketing strategy that targeted teenagers. This action seeks to hold JUUL, Altria

and others who acted in concert and independently towards the same goal accountable for their

tortious and illegal conduct resulting in serious harm to millions of individuals.

**PARTIES**

**Plaintiff**

7. Plaintiff Chasity Phillips is the parent and natural guardian of A.P. who is 17

years old. Plaintiff is resident of Miller County, Missouri, and is a citizen of the state of

_____

[2] The identities of the JUUL Affiliates are unknown to Plaintiff, but within the possession of
defendant JUUL.

Missouri.

8.     A.P. never smoked cigarettes before trying JUUL and was not previously addicted to nicotine. A.P. was most attracted to and preferred to use the fruit flavored JUULpods. He also enjoyed watching YouTube videos of people using JUUL and doing tricks while exhaling the vapor. A.P. did not know that JUUL delivered dangerously high concentrations of nicotine in every puff and was not safe to use.

9.     Plaintiff did not realize at first how addicted A.P. had become to nicotine until she attempted to take A.P.'s JUUL away. A.P. exhibited severe withdrawal symptoms and developed anxiety that he did not previously have when Plaintiff took the JUUL away.

10.    Plaintiff believes that Defendants were actively working in concert with others to market and advertise JUUL to youth and teenagers and that A.P. would not have become addicted to nicotine but for Defendants' actions.

**Defendants**

11.    Defendant Altria is a Virginia corporation, having its principal place of business in Richmond, Virginia.

12.    Defendant JUUL is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes and related products, including through sales at physical retail locations across the United States and internet sales through websites maintained by JUUL.

**JURISDICTION AND VENUE**

13.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

5

14.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b), and (d).  Defendants either reside, are found, or have an agent or transact their affairs in this District.

15.     Defendants have associates in and have participated in a fraudulent enterprise designed to market JUUL e-cigarettes and related products in a manner that misrepresents or conceals the harmful effects of nicotine use, including addiction.  As such, the "ends of justice" support the exercise of personal jurisdiction over Defendants by this Court.

16.     Defendants; contacts with this District and the United States as a whole satisfy the "minimum contacts" test, such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

17.     Venue is proper in this District pursuant to 18 U.S.C. §1965(a) and (b) as Defendants either reside, are found, have an agent or transact their affairs in this District, or the "ends of justice" support bringing Defendants before this Court.

18.     Venue in this District is alternatively appropriate under 28 U.S.C. § 1391 because Defendants are subject to the personal jurisdiction of this Court with respect to this action, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### The E-Cigarette Market and JUUL

19.     Although big tobacco companies had sought to replicate their success with traditional, combustible cigarettes in an electronic cigarette for years, the e-cigarette market began to take substance in 2010.  In 2010, NJoy, an Arizona based company, became the industry's first darling.  By 2013, e-cigarettes had grown to a $1.7-billion-a-year business.

NJoy's mistake, however, was marketing an e-cigarette product that looked nearly identical to a traditional cigarette. The stigma that came with being a smoker at this time stymied NJoy's sales and the company filed for bankruptcy in 2016.

20.     JUUL had also launched an e-cigarette product in 2010. JUUL's product resembled a fountain pen. JUUL's design failed to take off and drew only modest revenues: $30 million by 2015. To attain the multi-billion-dollar success of traditional cigarettes, JUUL knew it had to switch gears. The gear JUUL chose was not new. Rather, JUUL sought to replicate the financial success of traditional cigarettes by using the same playbook big tobacco used: design a product attractive to teens and market it directly to teens, thereby gaining customers for life.

21.     In 2015, JUUL launched its current design. Knowing it needed a product design that would avoid the stigma associated with smoking traditional cigarettes and ultimately appeal to youth, JUUL's revamped product resembled a device commonly found at schools and in backpacks across the country: a USB flash drive. JUUL's e-cigarettes are small enough to fit in the user's hand—making it easier to conceal their use by, for example, students—and come in stylish designs and colors.

22.     Each JUUL e-cigarette has two components. First, the e-cigarette, which holds the battery and temperature regulation system. The thin, rectangular e-cigarette is made up of an aluminum shell, a battery, a magnet for the USB-charger, a circuit board, an LED light, and a pressure sensor. Second, a pod, marketed as "JUULpods," which contain 0.7 milliliters of JUUL's patented liquid made up of nicotine, glycerol and propylene glycol, benzoic acid, and flavorants. The pod is inserted into the end of the e-cigarette device. When the device senses the movement of air, *i.e.*, the user sucking air through it, the liquid is then heated up, creating a

vapor, which quickly dissolves into the air. JUUL describes the e-cigarettes as an "easy to use vaporizer." Unlike the distinct odor produced by cigarette smoke, the odor emitted from a JUUL e-cigarette is a reduced aerosol. Like its sleek, stylish design, the lack of a potent odor enables users to conceal their use and avoid the stigma of being a smoker of traditional cigarettes.

23.     The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls the amount of nicotine vapor delivered. One study determined that there is a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." Another study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."

24.     In addition to its physical design that is appealing to youth and easily concealed, JUUL developed a new way of delivering nicotine, by mixing nicotine with a chemical called benzoic acid. The result is a quicker and stronger delivery of nicotine, which more closely resembles a traditional cigarette. But, medical researchers say it also makes JUUL's product more addictive for youth. And nothing in JUUL's e-cigarettes limits the amount of nicotine each puff delivers to that of a cigarette.

25.     Consistent with JUUL's deceptive practices, studies have shown that JUUL e-cigarettes contain higher levels of benzoic acid and nicotine than JUUL represents. Specifically, rather than the 4% benzoic acid solution disclosed in JUUL's patent paperwork, JUUL products have been found to have a benzoic acid solution of 4.5%. Likewise,

8

independent studies have revealed that a single JUULpod contains 6% nicotine or 60 mg/mL of nicotine per JUULpod.  JUUL represents that each JUULpod contains 5% or 50 mg/mL.

26.     JUUL e-cigarettes and JUULpods deliver toxins and carcinogens that are dangerous to their users, especially teenage users.  JUUL delivers doses of nicotine that are materially higher than combustible cigarettes.  The United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."  JUUL's nicotine concentration has been found to be 60 mg/ml, and JUUL's salt form increases the rate and efficiency of nicotine delivery.  JUULpods therefore substantially exceed the nicotine dose of a traditional cigarette.

27.     JUUL is also defective in design because it puts e-cigarette users, particularly adolescents or young adults with developing brains, at an increased risk of experiencing seizures.  Furthermore, JUUL's design is defective because users may inadvertently swallow the liquid in the JUULpods. The U.S. Food and Drug Administration ("FDA") is currently investigating reports of youth and young adults who are experiencing seizures following the use of e-cigarettes.

**The Marketing of JUUL**

28.     With a physical design that appealed to youth and a more powerful and addictive nicotine delivery system, all JUUL was missing was a plan to attract its target audience.  Again, JUUL took a page out of the big tobacco playbook.  According to JUUL co-founder James Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."  Indeed, Monsees has admitted that JUUL studied tobacco industry

documents. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them." Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019) (the "Stanford Report"). JUUL's "starter kits" cost around $35 in 2015, and a pack of four pods sold for $16—each roughly the same cost as a pack of cigarettes.

29.     JUUL's early marketing was nicknamed "Vaporized" and depicted flirtatiously posed young people holding JUULs. JUUL's early marketing also included attractive young people distributing free JUULs at movie and music events. JUUL's advertisements mimicked those of big tobacco and traditional cigarettes, including colorful ad images using eye-catching designs and youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that the JUUL e-cigarettes are "great tasting." JUUL pods came in sweet flavors including mango, fruit medley, cool mint, cool cucumber and crème brulee. According to one survey, 81% of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.

30.     The highly-successful "Vaporized" campaign was created by JUUL's Creative Director Steven Baillie along with Cult Collective LP ("Cult Collective") and Grit Creative, LLC ("Grit"). Cult Collective has admitted the "Vaporized" campaign "created ridiculous enthusiasm." JUUL's "Vaporized" campaign included no warnings about the risks of nicotine addiction or, remarkably, that JUUL's products contained nicotine.

31.     One way in which JUUL's marketing campaign differed from that of big tobacco in marketing traditional cigarettes was the media JUUL used to reach people. But this was not an altruistic departure from cigarette advertising. Rather, it was an improvement in

targeting youth, recognizing the power of social media in influencing the lives and habits of today's middle and high school kids.

32.     The Stanford Report analyzed JUUL's marketing campaign between its launch in 2015 and fall 2018. The researchers scrutinized thousands of social media posts (Instagram, Facebook, Twitter), emails to consumers, and ads (including internet-based ads the Company has since deleted). The Report's conclusion is damning: JUUL's marketing was "patently youth-oriented." Matt Myers, president of the Campaign for Tobacco-Free Kids observed: "It's impossible to review the data [in the paper] and conclude anything other than the marketing is the major reason this product became so popular among young people. As Massachusetts Attorney General Maura Healey said regarding her office's investigation into JUUL's marketing campaign: "This is about getting kids to start vaping, and make money and have them as customers for life."

33.     One effective strategy employed by JUUL was to hire the Social Media Influencers to promote JUUL's e-cigarette. JUUL created hashtags – #JUUL, #JUULvapor, #switchtoJUUL, #vaporized. As the Stanford Report found:

> JUUL has employed influencers – social media users with sizable followings recruited to increase brand awareness and to inspire sales. Confirming that JUUL used influencers since its inception was a June 2015 listing for an Influencer Marketing Intern. The job description makes clear: *"The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements ... to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of mouth and social media channels, etc."*

> Influencers are a form of paid promotion. For example, an influencer may earn $1000 for each 100,000 followers. A particularly well-documented example is that of DonnySmokes (Donny Karle, age 21), whose JUUL "unboxing" YouTube video garnered some 52,000 views. With 120,000 subscribers on his YouTube channel, Mr. Karl was able to earn a good income stream from vapor companies before YouTube interrupted his channel. In

11

October 2018, JUUL's website still requests applications to *"Join the JUUL Influencers."*

34. JUUL's Social Media Influencers would post youth-targeted advertising, often featuring images of young people JUULing, with JUUL's hashtags. Viral marketing campaigns pushed JUUL's products on children, teens, and young adults.

35. In addition to the use of the Social Media Influencers, JUUL used an undisclosed "affiliate program" to attract customers to JUUL's website. The Stanford Report describes the program:

> JUUL has used an affiliate program which makes payouts to online sites which refer business to them. In the vaping industry, this most often takes the form of sites which review the product favorably and include a link to the product's website, especially to their *"buy now"* section. JUUL partnered with the company Impact Radius (https://impact.com/) whose goal is to: *"optimize partner marketing investments."* In their affiliation application, JUUL explained: *How it works: You get paid by advertising performance campaigns to your audience on your blog, website, newsletter, search landing page. Depending on the specific terms of our agreement you can get paid as frequently as daily using direct deposit into your bank account.* It goes on to specify: *"The purpose of this Agreement is to allow HTML linking between your web site and the JUULvapor.com web site"* and *"At all times, you must clearly represent yourself and your web sites as independent from JUULvapor.com."*
>
> JUUL offers payment of as much as 25% of net sales for new customers and 10% of net sales for existing customers. On October 31, 2018 JUUL halted its affiliate program. JUUL did not wait for an internet admirer to apply to its affiliates program. In response to a complimentary tweet on JUUL's Twitter feed, the company replied with an invitation for the individual to join the affiliates program 18 times (15 in 2017 and 3 in 2018).

36. In 2016, JUUL made some changes to its marketing, but the deception and intent to target youth remained. For instance, JUUL's marketing would often depict themes like socialization and romance or style and identity. Instagram and Facebook ads included photos of pop-star Katy Perry with a JUUL at the Golden Globes. But most glaring was what

JUUL did not include in their advertising: adult smokers JUUL claimed it was targeting to switch from traditional cigarettes to JUUL.

37.     More recent changes to JUUL's marketing have included live testimonials from adults who claim to have switched from cigarettes to JUUL.  But according to Robert K. Jackler, M.D., one of the Stanford Report's authors: "The JUUL hashtag lives on.  It's immortal.  It's still viral in peer-to-peer teen promotion."  "The fact that Juul shut down its own social media postings had little effect," Dr. Jackler said.

38.     In January 2019, The Boulder Daily Camera published a front-page story about local educators' growing concerns over their students' use of JUUL.  Five days later, the principal at Nederland Middle-Senior High School in Boulder, CO, Carrie Yantzer, received a surprising email from someone introducing themselves as Bruce Harter, a former educator.  Mr. Harter claimed he was working with JUUL in developing anti-vaping curriculum for schools.  Mr. Harter said he "read about the challenges you're having with JUUL" and offered a free, three-hour curriculum provided by JUUL purportedly aimed at discouraging vaping amongst teens.  Ms. Yantzer was not the only school administrator to get such a letter.  Not surprisingly, that very same tactic—purportedly educating youth about the dangers of a product in order to surreptitiously market the product to them—was used by big tobacco in marketing traditional cigarettes.

39.     JUUL would later—after it had addicted scores of teens to its product—claim its marketing was never geared towards youth.  But as a former senior manager at JUUL has admitted, JUUL was "well aware it could appeal to [teenagers]."  And, in fact, as JUUL's e-cigarettes went on sale in June 2015, it was quickly apparent that teenagers were seduced by the marketing and were picking up JUUL's addictive, harmful products in droves.  It was

evident to JUUL that teenagers were either buying JUUL e-cigarettes online or enlisting others to buy for them. Indeed, some customers purchased more JUUL products than one could use, sometimes 10 or more devices. The product's success amongst teens did not go unnoticed at JUUL. JUUL's co-founder, Adam Bowen, has admitted he was aware early on of the risks e-cigarettes posed to teenagers.

40. JUUL's social media, youth-focused marketing worked. The Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18. The National Youth Tobacco Survey has found that 78.2% of middle and high-school students - 20.5 million youth - had been exposed to e-cigarette advertisements.

41. JUUL's sales reached $1 million by December 2015. In 2017, JUUL's revenues grew by 700%. JUUL now controls 72% of the e-cigarette market.

42. In July 2019, JUUL raised $1.2 billion and has a current valuation of approximately $16 billion.

43. In December 2018, Altria, the parent of Phillip Morris USA, Inc. ("Phillip Morris") invested $12.8 billion in JUUL, amounting to a 35% stake. Altria's announcement of its stake in JUUL came just weeks after Altria announced it would remove its e-cigarette products from the market to purportedly address the youth vaping epidemic.

44. In exchange for Altria agreeing to provide certain paid services to JUUL for at least six years, Altria agreed to a non-competition obligation with JUUL. Altria and JUUL also entered into a services agreement.

45. Under the agreements, Altria will, among other things, provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping

14

prevention, cigarette pack inserts and onserts, regulatory matters and government affairs. JUUL's access to Altria's retail shelf space will allow JUUL products to appear alongside traditional cigarettes like Phillip Morris's Marlboro brand, the country's most popular cigarette.

46. In addition, Philip Morris will send JUUL marketing messages to Phillip Morris's database of traditional cigarette smokers' mailing and email addresses.

47. On a December 20, 2018 conference call, Altria's Chief Executive Officer Howard Willard said Altria was "fortunate to be the tobacco company that's partnered up with JUUL" and that Altria's infrastructure, including its "leading sales organization," would help accelerate JUUL's growth and financial performance, to the benefit of both JUUL and Altria.

48. According to Dr. Jackler: "The joining of JUUL and Marlboro brings together the two dominant players in the teenage nicotine addiction market (e-cigarette & cigarette). This powerful combination constitutes a clear and present danger to the youth America as well as those around the world."

**The E-Cigarette Epidemic**

49. The FDA characterizes teen vaping as an epidemic. Indeed, smoking remains the leading cause of preventable death in the U.S., killing more than 480,000 people a year. Each year, cigarette smoking causes about one in every five deaths in the U.S. If smoking were to continue at the current rate among U.S. youth, 5.6 million of today's Americans under the age of 18 years are anticipated to die prematurely from a smoking-related illness. This represents about one in every 13 Americans aged 17 years or younger who are alive today.

15

50.     According to a recent survey of adolescent drug use, 11% of 12th graders,

8.2% of 10th graders, and 3.5% percent of eighth graders had vaped nicotine in the previous

30 days.  According to the Centers for Disease Control and Prevention ("CDC"), in 2017 2.1

million high-schoolers and middle schoolers used e-cigarettes.  That number rose by 1.5

million in 2018.  E-cigarette use increased 78% among high school students and 48% among

middle school students from 2017 to 2018.  As CDC Director Dr. Robert R. Redfield

explains: "The skyrocketing growth of young people's e-cigarette use over the past year

threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk

for nicotine addiction."

51.     An April 20, 2018 article in *The Wall Street Journal* titled "Schools and

Parents Fight JUUL E-Cigarette Epidemic," described the problems parents and

schools were facing with the meteoric rise of nicotine use by America's youth:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
> The device is called a JUUL and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes.  It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> *         *         *
>
> After two decades of declining teen cigarette use, "JUULing" is exploding. The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes.  JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette.  It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.

16

52.     A February 13, 2018 article published by the Lawrence (Kansas) Free State High School's Free Press Online, described the seduction of JUUL and students' growing addiction:

> Since most vape juices contain nicotine, laws have been put in place to keep minors from using the potentially addictive substance. The Food and Drug Administration prohibits anyone under the age of 18 from using any kind of vape product. Despite the current legislation, many minors are still able to obtain vaping devices. At Free State, underage use of vapes is quite typical. Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully.

*    *    *

> One of the reasons why vaping has become so popular is the "cloud" the user makes after exhaling the substance. The vapor is cooler than a traditional cigarette, and some students are fascinated with the many different things you can do with it, an anonymous senior said.

> "I think if you're doing it with people that you feel comfortable with then it's just a good time. People are fascinated by the cloud and the tricks." an anonymous senior said.

> Another attractive characteristic of vaping is the buzz that the user gets after inhaling the substance. It can be described as a short-term head high.

> "It's almost like being drunk—you feel it in your head and you just kind of wobble," senior Isaiah Jacobs said. "It's a dizzy feeling. It feels nice."
> The buzz is caused by nicotine which the vape juice contains. To a new user, vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk. "Some [people who vape] will admit it," senior Isaiah Jacobs said. "You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol."

> Once hooked, users inhale the many toxins that compose vape juice. Very little research has been conducted on the long-term effects that vaping has on a person's body according to pulmonologist Aman Kahn.

"I would definitely not encourage any youth to smoke at all," Kahn said. "Whether in large or small concentrations, nicotine is harmful. The other liquids in vape juice, such as propylene glycol, are harmful as well. We simply don't know what harm these liquids can cause when heated up, but there is obviously a possibility for carcinogenic effects."

With so little information available, students are unable to make an informed decision about whether or not to partake in vaping. Until further research has been conducted, underage users will continue to consume vape products without understanding the impacts that these substances can have on their health.

53.     JUUL's e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teen users.  Nicotine is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

54.     Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys.  Exposure to nicotine produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoking.  Vaping also triggers immune responses associated with inflammatory lung diseases.

55.     A study conducted by the American Journal of Medicine found that among young adults who did not smoke cigarettes, those who use e-cigarettes were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months.  Evidence also suggest that nicotine can affect an adolescent's neurological development and that when adolescents are exposed to nicotine they are at an increased risk of nicotine addiction. According to the National Institutes of Health, the "amount and speed of nicotine delivery … plays a critical

role in the potential for abuse of tobacco products." JUUL's e-cigarettes are the most potent on the market.

**Government Investigations**

56.     In April 2019, the FDA announced it was investigating JUUL's marketing efforts. The FDA has requested JUUL's research and marketing documents, including focus group data and toxicology reports.

57.     On September 12, 2018, the FDA sent letters to five e-cigarette manufacturers that represent more than 97% of the current market. JUUL and Altria were among these manufacturers. Dr. Gottlieb, commissioner of the FDA, stated these companies are "now on notice by the FDA of how their products are being used by youth at disturbing rates." The FDA also requested "the manufacturers of these brands and products to come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors." Dr. Gottlieb ordered the companies to "demonstrate that they're truly committed to keeping these [e-cigarettes] out of the hands of kids and they must find a way to reverse this trend."

58.     On October 4, 2018, JUUL stated it released 50,000 pages of documents to the FDA and that it "want[s] to be part of the solution in preventing underage use."

59.     Altria's CEO met with the FDA on October 18, 2018. Altria acknowledged its obligation to combat the youth e-cigarette epidemic.

60.     In an October 25, 2018 public letter to the FDA, Altria's Howard said "we share [the FDA's] concerns and … are alarmed about the reported rise in youth e-vapor use to epidemic levels." Altria admitted that "pod-based products significantly contribute to the rise in youth use of e-vapor products." Altria claimed it was taking steps to combat youth vaping.

19

61. On November 14, 2018, JUUL announced a plan to combat underage use.

62. On November 15, the CDC revealed that e-cigarette use in general increased 78% among high school students and 48% among middle school students from 2017 to 2018. The FDA Commissioner called these results "astonishing."

63. On December 18, 2018, the Secretary of the U.S. Department of Health and Human Services, Alex Azar, stated at a press conference: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

## CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Nationwide Class and Missouri Class (together, the "Class"):

> **Nationwide Class**: All persons who purchased or otherwise acquired a JUUL e-cigarette or JUULpods in the United States, or, if such person is a legal minor, the parent or legal guardian of the minor. Excluded from the class are owners, officers, directors, employees, agents and/or representatives of Defendants and their parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel, and members of their immediate families.

> **Missouri Class**: All residents of the state of Missouri who purchased or otherwise acquired a JUUL e-cigarette or JUULpods in the United States, or, if such person is a legal minor, the parent or legal guardian of the minor. Excluded from the class are owners, officers, directors, employees, agents and/or representatives of Defendants and their parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel, and members of their immediate families.

65. <u>Numerosity</u>. The members of the Class are so numerous and geographically dispersed that individual joinder of members is impracticable. The identity and precise

number of Class members, which is unknown to Plaintiff but can be ascertained from the records of Defendants, is likely in the tens or hundreds of thousands.

66.     <u>Commonality and Predominance</u>.  This action involves common questions of law and fact, which predominate over any questions affecting only individual members of the Class.  These common fact and legal questions include, but are not limited to:

a.     The design and manufacture of JUUL e-cigarettes and JUULpods

b.     The marketing of JUUL e-cigarettes and JUULpods;

c.     The effects of nicotine use, including from JUUL e-cigarettes and JUULpods, on consumers including adolescents;

d.     Whether Defendant JUUL was unjustly enriched;

e.     Whether Defendant JUUL was negligent;

f.     Whether Defendant JUUL failed to warn consumers of the harmful effects of, including the likelihood of addiction, using JUUL products;

g.     Whether JUUL products were defective;

h.     Whether Defendants JUUL and Altria engaged in a pattern of racketeering activity (mail and/or wire fraud);

i.     Whether the JUUL Marketing Enterprise (defined below) is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

j.     Whether Defendants JUUL and Altria conducted or participated in the affairs, directly or indirectly, of the JUUL Marketing Enterprise;

k.     Whether the pattern of racketeering alleged caused the injury to property alleged;

l.     Whether Plaintiff and the other members of the Class have suffered damages;

m.     Whether Plaintiff and the other members of the Class are entitled to appropriate equitable remedies; and

n.     Whether Plaintiff and the other members of the Class are entitled to monetary damages, including treble damages under the RICO Act.

67.     Typicality.  Plaintiff's claims are typical of the claims of the other members of the Class because, inter alia, all Class members were injured through the same course of conduct alleged herein.

68.     Adequacy of Representation.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no interests adverse or antagonistic to those of the Class.

69.     Superiority.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

70.     Propriety of Declaratory Relief. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

### Count I – Nationwide Class
### Violation of the Racketeer Influenced Corrupt Organizations Act § 1962(a), (c) & (d)

71.     Plaintiff incorporates by reference all preceding paragraphs 1 to 70.

72.     Defendants are each a "person" under 18 U.S.C. §1961(3).

73.     Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

74.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

75.     Section 1962(d) makes it unlawful for "any person to conspire to violate" §§ 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

76.     The enterprise, the activities of which affected interstate and foreign commerce, was comprised of an association in fact of persons consisting of JUUL, Altria, Cult Collective, Grit, Impact Tech, Inc. ("Impact Tech"), the Social Media Influencers, and the JUUL Affiliates (collectively, the "JUUL Marketing Enterprise"). Altria joined the existing JUUL Marketing Enterprise in December 2018, at the time it acquired its 35% stake in JUUL.

Case 2:19-cv-04172-MDH   Document 1   Filed 08/21/19   Page 23 of 38

77.     Cult Collective is a marketing agency headquartered in Calgary, Alberta.

78.     Grit is a marketing agency incorporated in Kentucky and headquartered in Frankfort, Kentucky.

79.     Impact Tech, is an advertising and affiliate marketing company whose self-described mission is "to deliver disruptive innovations in technology to help our clients successfully navigate the ever-changing, digital landscape and grow their business." Impact Tech maintains U.S. offices in New York, California, Ohio, and Washington.

80.     JUUL, in concert with Impact Tech, utilized a deceptive affiliate program whereby purportedly independent entities—the JUUL Affiliates—were to promote JUUL products and steer would-be consumers to JUUL's web site. The JUUL Affiliates were compensated for their services, as was Impact Tech for facilitating JUUL's affiliate program. JUUL expressly directed the JUUL Affiliates to not disclose their affiliation with JUUL.

81.     The JUUL Marketing Enterprise functions to achieve shared goals, particularly financial gain, through unlawful means. In particular, the JUUL Marketing Enterprise led the public to believe that it did not market to teenagers with the intent of addicting those teenagers for life. Furthermore, the JUUL Marketing Enterprise failed to accurately inform consumers about the health risks posed by e-cigarettes and JUUL's e-cigarette in particular. These deceptive acts were taken with the express intent of growing JUUL's market share and increasing JUUL's revenue, thereby causing financial gain to each of the JUUL Marketing Enterprise's constituents. In addition to enhancing the fortunes of its members, some of the increased revenues were used to operate and expand the JUUL Marketing Enterprise.

82.     JUUL, Atria, Cult Collective, Grit, Impact Tech, the Social Media Influencers, and the JUUL Affiliates were associated with an illegal enterprise, and conspired, conducted,

and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343, all in violation of RICO, 18 U.S.C. §§1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) sending and receiving thousands of statements over a number of years that contained deceptive statements regarding JUUL's e-cigarettes, the effects of nicotine use, the likelihood of becoming addicted to nicotine use, the design of JUUL's e-cigarettes, the amount of nicotine in JUULpods, and that JUUL's e-cigarettes were intended for use by adults who were already addicted to nicotine use rather than by teens who were new nicotine users; and (2) sending payments over that same time to further and guarantee the success of the deceptive acts described in (1).

83.     JUUL, Altria, Cult Collective, Grit, Impact Tech, the Social Media Influencers, and the JUUL Affiliates profited from the enterprise, and Plaintiff and the Class suffered injury to their property because they would not have purchased JUUL e-cigarettes and JUULpods but for the deceptive acts of the JUUL Marketing Enterprise. The members of the JUUL Marketing Enterprise used the proceeds from their deceptive acts to further the scheme by, among other things, expanding the depth and breadth of the deceptive marketing. For example, JUUL began offering to sponsor purportedly education-related activities under the guise of preventing underage use of e-cigarettes. In reality, JUUL sought to raise awareness of its products and gain additional underage users.

84.     JUUL, Altria, Cult Collective, Grit, Impact Tech, the Social Media Influencers, and the JUUL Affiliates conspired to deceive Plaintiff and the Class.

85. The members of the JUUL Marketing Enterprise all share a common purpose: to increase JUUL's market share and enhance the financial gain of each member of the enterprise by deceptively marketing JUUL, including downplaying the dangers posed by nicotine use and, in particular, the unparalleled potency of JUUL's e-cigarette.

86. The JUUL Marketing Enterprise has existed since at least 2015. It has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity. Each member's participation in the JUUL Marketing Enterprise is necessary for the successful operation of the deceptive marketing scheme and the financial gains that resulted therefrom, which is the common purpose of the JUUL Marketing Enterprise.

87. Plaintiff and each member of the putative Class have sustained injury to his or her property by reason of the acts and conduct of Defendants alleged in this Complaint, including their loss of money due to their purchases of JUUL products which but for the deceptive market and other acts of the JUUL Marketing Enterprise, they would not have made.

88. Plaintiff and members of the Class were the direct targets of Defendants' scheme. The predicate acts of the JUUL Marketing Enterprise all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiff and the Class.

89. But for the conduct of Defendants alleged herein, Plaintiff and members of the Class would not have been injured. The injury suffered by Plaintiff and each member of the Class herein was a foreseeable and natural consequence of the scheme to defraud.

90. The injuries of Plaintiff and members of the proposed Class were directly and proximately caused by Defendants' racketeering activity that deceived and defrauded

26

consumers, and which allowed Defendants to charge excessive prices compared to their true value.

91.     As a result and by reason of the foregoing, the Plaintiff and Class members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

92.     In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future.

93.     Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity and disgorging ill-gotten gains is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to issue appropriate orders to provide equitable relief to civil RICO plaintiffs and enjoin violations of 18 U.S.C. § 1962.

94.     Plaintiff seeks compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees.

## Count II

### Strict Product Liability – Failure to Warn – Missouri State Law Class

95.     Plaintiff incorporates by reference all preceding paragraphs 1 to 94.

96.     Defendant JUUL manufactured, distributed and sold and promoted JUUL e-cigarettes, or have partnered to manufacture, distribute, sell and promote JUUL.

97.     At all times relevant, Defendant JUUL was well-aware of the dangers of nicotine addiction as described herein.

98.     At all times relevant, Plaintiff and members of the Class were not aware of and would not have recognized the risks of using a JUUL e-cigarette with a JUUL pod because

Case 2:19-cv-04172-MDH   Document 1   Filed 08/21/19   Page 27 of 38

Defendant JUUL intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

99. In all forms of advertising, including but not limited to social media communications, Defendant JUUL failed adequately to warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction. Defendant JUUL failed adequately to warn in their advertising or anywhere on the product label that the product was not safe for minors, and instead, posed serious immediate and long-term health risks, and should not be used or consumed by them. Rather, Defendant JUUL intentionally marketed its products to minors in youth-friendly colors and flavors. Defendant also designed its products to be more palatable to youth and nonsmokers by making JUUL e-cigarettes easier to inhale while increasing the level of nicotine that is absorbed by users, making them even more addictive.

100. The defects in JUUL's products, including the lack of warnings, existed at the time the JUULpods and devices were sold and/or when the JUULpods and devices left JUUL's possession or control.

101. JUUL's e-cigarettes and JUULpods were anticipated to be used by Plaintiff and the Class without substantial change in their condition from the time of their manufacture or sale.

102. Plaintiff and members of the Class were harmed directly and proximately by Defendant JUUL's failure to warn. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they have paid a premium as a result of Defendant JUUL's failure to warn.

28

**Count III**

**Strict Product Liability – Design Defect – Missouri State Law Class**

103.    Plaintiff incorporates by reference all preceding paragraphs 1 to 102.

104.    Defendant JUUL designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL e-cigarettes and JUULpods, which were intended by Defendant JUUL to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

105.    Defendant JUUL knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including Plaintiff and members of the class.

106.    As described herein, Defendant JUUL designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product.

107.    Because JUUL products deliver significantly more nicotine than Defendant JUUL represents, they are inherently defective.  In addition, because JUUL products are made to create and sustain addiction, they are unreasonably dangerous.  The risks inherent in the design of JUUL outweigh significantly any benefits of such design.

108.    At all relevant times, Defendant JUUL could have employed reasonably feasible alternative designs to prevent the harms discussed herein.

109.    At all relevant times, Plaintiff and the Class were unaware of the design defects described herein. Further, Defendant JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth,

inexperience and/or immaturity of judgment, would recklessly disregard such risks.

110.    Plaintiff and members of the Class were harmed directly and proximately by Defendant JUUL's defectively designed JUUL e-cigarette and JUULpods. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL products or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendant JUUL's defective products.

## Count IV

### Negligence – Missouri State Law Class

111.    Plaintiff incorporates by reference all preceding paragraphs 1 to 110.

112.    Defendant JUUL, directly or indirectly, caused JUUL products to be purchased and/or used by Plaintiff.

113.    At all times relevant to this litigation, Defendant JUUL had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

114.    At all times relevant to this litigation, Defendant JUUL had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products. Defendant JUUL's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using JUUL and appropriate, complete,

Case 2:19-cv-04172-MDH   Document 1   Filed 08/21/19   Page 30 of 38

and accurate warnings concerning the potential adverse effects of nicotine use and, in particular JUUL's patented nicotine salts and the chemical makeup of JUULpods liquids.

115. At all times relevant to this litigation, Defendant JUUL knew or, in the exercise of reasonable care, should have known of the hazards and dangers of JUUL products and specifically, the health hazards posed by continued use of nicotine, particularly among adolescents.

116. Accordingly, at all times relevant to this litigation, Defendant JUUL knew or, in the exercise of reasonable care, should have known that use of JUUL e-cigarettes and JUULpods could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

117. Defendant JUUL also knew or, in the exercise of reasonable care, should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products including but not limited to the risk of continued nicotine use and nicotine addiction.

118. As such, Defendant JUUL breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its JUUL e-cigarettes and JUULpods, in that Defendant JUUL manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

31

119. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant J U U L has failed to do so. Indeed, Defendant J U U L has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

120. Defendant JUUL's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing;

b. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not JUUL products were safe for their intended use;

c. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine;

d. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant JUUL could reasonably foresee would use its JUUL products;

e. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction;

f. Representing that its J U U L products were safe for their intended use when, in fact, Defendant J U U L knew or should have known that the products were not safe for their intended use;

g. Declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the risks of JUUL products and nicotine vaping;

h. Advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendant J U U L to be associated with or caused by the use of JUUL products and nicotine;

  i. Continuing to disseminate information to its consumers, which indicate or imply that Defendant JUUL's products are not unsafe for their intended use; and

  j. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

121. Defendant JUUL knew and/or should have known that it was foreseeable that users, such as Plaintiff, would suffer injuries as a result of Defendant JUUL's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

122. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods liquids.

123. Defendant JUUL's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

124. Defendant JUUL's conduct, as described above, was reckless. Defendant JUUL regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant JUUL has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant JUUL's reckless conduct therefore warrants an award of aggravated or punitive damages.

125. As a proximate result of Defendant JUUL's wrongful acts and omissions in placing its defective JUUL products into the stream of commerce without adequate warnings of their hazardous nature, Plaintiff has been injured and suffered economic damages and will continue to incur expenses in the future.

## Count V

## Unjust Enrichment – Missouri State Law Class

126. Plaintiff incorporates by reference all preceding paragraphs 1 to 125.

127. Plaintiff and members of the Class conferred benefits on Defendant JUUL, Cult Collective, Grit, Impact Tech, the Social Media Influencers, and other JUUL Affiliates by purchasing JUUL products that generated revenue, advertising revenue, commissions, and incentives for Defendant JUUL and its affiliates.

128. As a result of Defendant JUUL's unlawful and deceptive actions described above, Defendant JUUL was enriched at the expense of Plaintiff and the Class.

129. Defendant JUUL retained the benefits under such circumstances as make the retention inequitable. Specifically, JUUL, Altria, Cult Collective, Grit, Impact Tech, the Social Media Influencers, and the JUUL Affiliates deceptively marketed and distributed JUUL's e-cigarettes and JUUL pods in order to gain market share and revenue through increased usage of JUUL's products by teens.

130. Plaintiff and the Class have been harmed by Defendant JUUL's unjust enrichment and are entitled to a proper restitutionary remedy and all other relief to which they may be entitled.

## Count VI

### Violation of Missouri Merchandizing Practice Act, § 407.020 et seq. – Missouri State Law Class

131. Plaintiff incorporates by reference all preceding paragraphs 1 to 130.

132. At all relevant times, Plaintiff purchased and used JUUL for personal use.

133. At all relevant times, Defendant JUUL knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to JUUL products.

34

134. At all relevant times, Defendant JUUL, through its labeling, advertisements, public representations and marketing of JUUL products, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that JUUL products are safe for use.

135. At all relevant times, Defendant JUUL also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of JUUL products in trade or commerce. In particular, Defendant JUUL failed to disclose to the public that the JUUL products are unsafe and pose serious health hazards. Defendant JUUL was aware of the hazardous risks posed by JUUL products and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. The Defendant JUUL's failure to state material facts about JUUL products constitutes a violation of R.S.M.O. § 407.020.

136. At all relevant times, Plaintiff was deceived by Defendant JUUL's intentional misrepresentations and omissions, including by the orchestrated claims made on social media, advertising materials, websites, and on product labels and packaging regarding the usage and safety of JUUL products.

137. At all relevant times, Plaintiff acted in reasonable reliance upon the Defendant JUUL's unlawful trade practices, and had the Defendant JUUL not engaged in the deceptive conduct described herein, Plaintiff would not have purchased JUUL.

## Count VII

### Negligent Misrepresentation – Missouri State Law Class

138. Plaintiff incorporates by reference all preceding paragraphs 1 to 137.

Case 2:19-cv-04172-MDH   Document 1   Filed 08/21/19   Page 35 of 38

139. Defendant JUUL had a duty to accurately represent to Plaintiff and other consumers the significant health hazards posed by use of JUUL e-cigarettes and JUULpods and to accurately represent whether said products were fit for their intended use.

140. The representations made by Defendant JUUL were, in fact, false.

141. Defendant JUUL failed to exercise reasonable care in the representations of JUUL products, while involved in their manufacture, sale, and/or distribution of said products into interstate commerce for the pecuniary gain of Defendant JUUL, in that Defendant JUUL negligently misrepresented the high risk of significant health hazards, including nicotine addiction, associated with the use of JUUL products.

142. Defendant JUUL breached its duty in misrepresenting the high risk of significant health hazards, including nicotine addiction, associated with the use of JUUL products to Plaintiff and other consumers.

143. In reliance upon said representations, Plaintiff was induced to and did purchase and use JUUL products.

144. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer adverse health effects, including increased risk of significant health problems and monetary damages.

### Count VIII

### Fraudulent Misrepresentation – Missouri State Law Class

145. Plaintiff incorporates by referenced all preceding paragraphs 1 to 144.

146. Defendant JUUL falsely and fraudulently represented to consumers, including Plaintiff and other consumers, that JUUL e-cigarettes and JUULpods were safe for their intended

use and fit for their intended use, and claimed that use of JUUL e-cigarettes and JUULpods was a healthy alternative to smoking traditional cigarettes.

147.    The representations made by Defendant JUUL were, in fact, false.

148.    When said representations were made by Defendant JUUL, it knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

149.    These representations were made by Defendant JUUL with the intent of defrauding and deceiving Plaintiff and other consumers, and were made with the intent of inducing Plaintiff and other consumers to purchase JUUL products, all of which evinced a callous, reckless, willful, depraved indifference to the health and welfare of Plaintiff and the Class.

150.    At the time the misrepresentations were made by Defendant JUUL, and at the time Plaintiff used JUUL e-cigarettes and JUUL pods, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

151.    In reliance upon said representations, Plaintiff was induced to and did purchase and use JUUL products.

152.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer adverse health effects, including increased risk of significant health problems and monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

      a.      Certifying the Nationwide Class and/or Missouri Class as requested herein;

b.    Awarding Plaintiff and Class members compensatory damages, trebled, in an amount to be determined at trial;

c.    Ordering all appropriate equitable remedies, including but not limited to declaratory and injunctive relief;

d.    Awarding Plaintiff and Class members attorneys' fees and costs; and

e.    Affording Plaintiff and Class members with such further and other relief as deemed just and proper by the Court.

Respectfully submitted,

/s/ Thomas P. Cartmell

Thomas P. Cartmell, MO #45366
Jonathan P. Kieffer, MO #49025
Tyler W. Hudson, MO #53585
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, MO  64112
Tel. (816) 701-1100
Fax (816) 531-2372
tcartmell@wcllp.com
jpkieffer@wcllp.com
thudson@wcllp.com

*Attorneys for Plaintiff*